# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 14, 2016          Decided March 4, 2016

No. 14-1138

SIERRA CLUB DE PUERTO RICO, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND GINA
MCCARTHY,
RESPONDENTS

ENERGY ANSWERS ARECIBO, LLC,
INTERVENOR

On Petition for Review of a Final Rule of the
United States Environmental Protection Agency

*Christopher D. Ahlers* argued the cause for petitioners. With him on the briefs was *Douglas A. Ruley*.

*Andrew J. Doyle*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the briefs were *John C. Cruden*, Assistant Attorney General, *Brian L. Doster* and *Elliott Zenick*, Counsel, U.S. Environmental Protection Agency.

*Brendan K. Collins* argued the cause and filed the brief for intervenor Energy Answers Arecibo, LLC.

Before: WILKINS, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: There is a lead problem in Arecibo, Puerto Rico, where Intervenor-Respondent, Energy Answers Arecibo LLC, seeks to build a waste incinerator. Energy Answers obtained both federal and state[1] permits for the project as required under the Clean Air Act ("CAA"). Petitioners – three non-profit organizations and an association of residents, collectively referred to here as Sierra Club – do not challenge these permits. Instead, Sierra Club seeks to vacate a 1980 rule promulgated by Respondent Environmental Protection Agency ("EPA"). *See* Requirements for Preparation, Adoption, and Submittal of SIPS; Approval and Promulgation of State Implementation Plans, 45 Fed. Reg. 31,307, 31,312 (May 13, 1980) (codified at 40 C.F.R. § 51.165(a)(2)(i)). The rule implements the CAA's permitting scheme as it relates here to the regulation of the incinerator's lead emissions.

The CAA provides for two permitting programs, which the parties refer to as "Prevention of Significant Deterioration" ("PSD"), *see* 42 U.S.C. § 7470 *et seq.*, and "Nonattainment New Source Review" ("NNSR"), *see id.* § 7501 *et seq.* PSD applies to "attainment" areas – areas that comply with CAA standards for how much of a certain pollutant the air can safely contain. *Id.* § 7407(d)(1)(A)(ii). Because the incinerator will be located in a "nonattainment" area for lead, meaning the amount of lead in the air exceeds

---

[1] The Clean Air Act defines states to include the Commonwealth of Puerto Rico and other U.S. territories. 42 U.S.C. § 7602(d).

the CAA standard, *id.* § 7407(d)(1)(A)(i), the PSD program does not regulate the plant's lead emissions, *id.* § 7471. NNSR applies instead and contains very strict compliance measures, but is only triggered by pollution sources that emit 100 tons per year or more of the nonattainment pollutant. *Id.* §§ 7502(c)(5), 7602(j); 40 C.F.R. § 51.165(a)(2)(i).

Energy Answers' plant is forecast to emit 0.31 tons per year of lead, so it falls below the 100 ton per year emission threshold that triggers the strict NNSR compliance measures. The crux of Petitioners' claim is that lead is dangerous in very small amounts, and there is already too much of it in the air at the proposed incinerator site. Petitioners argue the regulatory scheme unreasonably creates a loophole for the incinerator, whose lead emissions will make the nonattainment problem worse. Unfortunately for Petitioners, their challenge comes too late. Accordingly, we dismiss Sierra Club's petition as time-barred under 42 U.S.C. § 7607(b)(1).

**I.**

Under the CAA, the EPA must create National Ambient Air Quality Standards ("NAAQS"). 42 U.S.C. § 7409(a). NAAQS are standards that say the air can safely contain only so much of a particular pollutant. *See Sierra Club v. Jackson*, 648 F.3d 848, 851 (D.C. Cir. 2011). They exist for six pollutants, including the one at issue in our case: lead. *Util. Air Regulatory Grp. v. Envtl. Prot. Agency* (*UARG*), 134 S. Ct. 2427, 2435 (2014).

EPA last revised the NAAQS for lead in 2008 and made them more stringent. As the agency recognizes, lead exerts "a broad array of deleterious effects on multiple organ systems." National Ambient Air Quality Standards for Lead, 73 Fed. Reg. 66,964, 66,975 (Nov. 12, 2008). It gets into our

bloodstream and affects neurological development and function, reproduction and physical development, kidney function, cardiovascular function, and immune function. *Id.* Lead is especially bad for children. The Centers for Disease Control warns there is "no 'safe' threshold" for the amount of lead in the blood levels of young children. *Id.* at 66,972.

In order to achieve and maintain the NAAQS, the CAA requires states to regulate new construction of stationary sources of pollution. They do so through the PSD and NNSR programs, according to which new sources must obtain either PSD or NNSR state permits prior to construction.[2]  *See* 42 U.S.C. §§ 7407(a), 7475(a), 7502(c)(5). The new source might have to get one or both types of permits depending on if the source is considered "major," what it emits, and where it is located.

PSD permits are necessary in attainment areas. *Id.* § 7475(a); *Alabama Power Co. v. Costle*, 636 F.2d 323, 365 (D.C. Cir. 1979). The new source, however, must qualify as a "major emitting facility." *Id.* § 7475(a). The PSD program does not use the Act's general definition of "major emitting facility," located at 42 U.S.C. § 7602(j). Instead, a source qualifies under this part of the statute in one of two ways: 1) if it is one of 28 enumerated types of sources with the potential

---

[2] For the most part, states issue these permits, but in some cases – like in Puerto Rico – the EPA grants them. *See* 40 C.F.R. §§ 52.21 (providing minimum federal standards upon plan disapproval), 52.2729 (indicating Puerto Rico does not meet the PSD requirements and incorporating 40 C.F.R. § 52.21). This is because the EPA must approve all state implementation plans ("SIPs"), 42 U.S.C. § 7410(k)(3), which contain the CAA's minimum PSD and NNSR permitting requirements, *id.* §§ 7471, 7475(a), 7502(c)(5). If a SIP or a portion of it does not meet approval, the agency can step in and administer that part directly. *Id.* § 7410(c)(1).

to emit 100 tons per year or more of "any air pollutant," or; 2) if it is any other stationary source with the potential to emit 250 tons per year or more of any air pollutant. *Id.* § 7479(1). To obtain a PSD permit, the new source must, among other things, install the "best available control technology" ("BACT") for pollutants emitted in significant amounts, *id.* § 7475(a)(4); 40 C.F.R. §§ 51.166(j)(2), 52.21(j)(2).

NNSR permits are required in nonattainment areas. 42 U.S.C. § 7502(c)(5). The new source must also qualify as major, but the NNSR program uses the statute's general definition of "major stationary source." *Id.* §§ 7502(c)(5), 7602(j). The CAA defines "major stationary source" as one with the potential to emit 100 tons per year or more "of *any* air pollutant." *Id.* § 7602(j) (emphasis added). Thus, under the statute, a major source should fall under the NNSR umbrella if it emits 100 tons per year of any pollutant.

The statute is not the end of the story, however, because 40 C.F.R. § 51.165(a)(2)(i) further limits that definition. Under that regulation, the NNSR program "shall apply to any new major stationary source or major modification *that is major for the pollutant for which the area is designated nonattainment*." 40 C.F.R. § 51.165(a)(2)(i) (emphasis added). Because of this rule, promulgated in 1980, the trigger for NNSR permits is whether the source emits 100 tons per year or more of the nonattainment pollutant. *See id*; 42 U.S.C. § 7602(j).

Under the NNSR program, the major source must meet two significant requirements in particular before it can obtain an NNSR permit. It must install technology that will achieve the "lowest achievable emission rate" ("LAER"), 42 U.S.C. § 7503(a)(2), and it must secure emissions "offsets," *id.* § 7503(a)(1)(A). LAER is a more stringent control

technology than BACT, *compare id.* § 7479(3), *with id.* § 7501(3), and an offset is achieved by obtaining emission reductions from preexisting sources to counteract the proposed emissions by the new source, *see id.* § 7503(a)(1)(A).

## II.

The EPA administers Puerto Rico's PSD program, *id.* § 7410(c)(1); 40 C.F.R. §§ 52.21, 52.2729, whereas the Commonwealth administers the NNSR program, *see* 40 C.F.R. § 52.2722 (finding Puerto Rico's SIP satisfies Part D of the CAA). Energy Answers applied to the EPA for its PSD permit in early 2011, projecting that the proposed waste incinerator would produce 0.31 tons per year of lead emissions. In November 2011, the EPA designated a part of Arecibo in nonattainment for lead, concluding that a local battery recycling facility was the primary source responsible for this deterioration in air quality.

In May 2012, the EPA announced through a public notice its preliminary determination to approve the PSD permit for the waste incinerator. The notice listed over 12 pollutants that would be subject to BACT under the PSD program. During a lengthy public comment period, the agency received 1,100 written comments, some of which expressed concern about how the nonattainment designation for lead factored into the approval process. The EPA let the community know that the PSD permit did not regulate lead in the nonattainment area, that any pollutants not subject to PSD would be addressed in the NNSR permit issued by Puerto Rico, but that the facility would not emit 100 tons per year of lead in any case and so was not subject to the NNSR requirements.

In June 2013, the EPA issued the final PSD permit decision. The next month, five petitions for review from this decision were filed with the Environmental Appeals Board ("EAB"). The EAB denied the petitions and upheld the permit, except for a limited remand on the issue of biogenic greenhouse gas emissions that does not affect our case. The EAB rejected Petitioners' argument that the PSD permit should regulate lead, because nonattainment pollutants are exempted from PSD regulation, and the authority to administer the NNSR program resides with Puerto Rico.

In December 2014, Puerto Rico issued Energy Answers its NNSR permit. No NNSR restrictions applied to its lead emissions since the plant's potential to emit was projected to be less than 100 tons per year for lead. However, Puerto Rico included a "Minor New Source" permit restricting lead emissions to 0.31 tons per year, consistent with Energy Answers' previous projections. Minor source review is not at issue in our case, but it is another way to impose preconstruction requirements on sources that do not qualify as "major" in the service of attaining and maintaining the NAAQS. *See* DAVID R. WOOLEY & ELIZABETH M. MORSS, CLEAN AIR ACT HANDBOOK: A PRACTICAL GUIDE TO COMPLIANCE 232 (25th ed. 2015) (citing 42 U.S.C. § 7410(a)(2)(C); 40 C.F.R. § 51.160-64).

In July of 2014, Petitioners sought review in our Court of the 1980 rule, alleging that it violated the CAA. The petition also nominally asked for review of the EPA decision granting the PSD permit, and the EAB decision, but did not further elaborate on the permit or permit appeal. The EPA moved to dismiss the case, arguing in part that the petition was time-barred. We referred the case to a merits panel, granted Energy Answers leave to intervene, and now dismiss the petition.

**III.**

Sierra Club argues that in enacting the 1980 rule, EPA impermissibly interpreted "any air pollutant" in the definition of a major emitting source under the statute, 42 U.S.C. § 7602(j), to mean "the pollutant for which the area is designated nonattainment," 40 C.F.R. § 51.165(a)(2)(i). It believes the agency's reasoning for this limitation first appeared in a footnote, where the EPA noted it was rephrasing the major source requirement "[f]or simplicity." Requirements for Preparation, 45 Fed. Reg. at 31,309 n.3. The EPA admits it did not further elaborate on this interpretation of the CAA when the rule was originally promulgated, though it offered several justifications months later when it relocated the rule to a different part of the Code of Federal Regulations. *See* Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676, 52,711 (Aug. 7, 1980). Sierra Club argues the interpretation is nonetheless unlawful and will allow Energy Answers to construct its incinerator free from NNSR permit requirements, which is dangerous because the plant is projected to emit more lead per year than the battery recycling facility that caused the nonattainment problem in the first place.

**A.**

Before reaching the merits, we must decide if Sierra Club's petition is timely. *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 460 (D.C. Cir. 1998) (describing the time limit pursuant to 42 U.S.C. § 7607(b) as jurisdictional in nature). Under the CAA's judicial review provision, "the Clean Air Act sets a 60-day period for challenges to EPA regulations, with a renewed 60-day period available based on

the occurrence of after-arising grounds."[3] *Am. Rd. & Transp. Builders Ass'n v. Envtl. Prot. Agency* (*ARTBA II*), 705 F.3d 453, 456 (D.C. Cir. 2013), *cert. denied*, 134 S. Ct. 985 (2014); *accord* 42 U.S.C. § 7607(b)(1). The question for us is what constitutes after-arising grounds, which the statute does not define.

Sierra Club contends that the grounds for its challenge arose on May 19, 2014, when the EPA published notice of Energy Answers' final permit. Its argument almost exclusively relies on *Coalition for Responsible Regulation, Inc. v. Environmental Protection Agency* (*Coalition*), where we explained that the "exception" for after-arising grounds "encompasses the occurrence of an event that ripens a claim." 684 F.3d 102, 129 (D.C. Cir. 2012), *rev'd in part on other grounds sub nom*, *UARG*, 134 S. Ct. 2427. Under Sierra Club's logic, its claim ripened when the EPA granted the PSD permit, and they timely filed for review within 60 days of the permit decision, on July 17, 2014.

We disagree. Sierra Club exaggerates the parallels between *Coalition* and its own petition. The *Coalition* litigation arose after the EPA promulgated the "Tailpipe Rule," which restricted greenhouse gas emissions from cars and light trucks. 684 F.3d at 115. By virtue of this rule, greenhouse gases became a pollutant regulated under the CAA, which triggered other parts of the statute, including

---

[3] The relevant portion of the text reads: "Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise." 42 U.S.C. § 7607(b)(1).

PSD review. *Id.* (explaining that under PSD, a source becomes a major emitting facility when it emits certain levels of "any air pollutant," meaning any air pollutant regulated under the statute).[4] All of a sudden, major stationary sources were subject to PSD requirements for greenhouse gases.[5] As a result, industry petitioners challenged the PSD permitting triggers within 60 days of the Tailpipe Rule's promulgation. *Id.* at 130. The EPA countered that the challenge was untimely, given that the PSD regulations were promulgated in 1978, 1980, and 2002. *Id.* at 129.

We decided that the Tailpipe Rule "ripened" industry petitioners' challenges because of the substantial probability of injury to them, *i.e.*, their members now had to get PSD permits. *Id.* at 131. A few points were particularly important in reaching this conclusion. First, we acknowledged that petitioners offered a legal argument that was available during the earlier, normal judicial review period, and that their proffered "new ground" was a factual development, but said such circumstances alone "fail[ed] to demonstrate" untimeliness. *Id.* at 130. What really mattered was that if petitioners had challenged EPA's interpretation of the PSD permitting triggers in 1978, 1980, or 2002, their injuries would have been speculative, and we would have lacked jurisdiction under Article III. *Id.* at 131. We were mindful of past case law "assur[ing] petitioners with unripe claims that

---

[4] The Supreme Court later rejected the idea that the CAA prevented the EPA from applying a narrower, context-appropriate interpretation of "any air pollutant." *UARG*, 134 S. Ct. at 2442.

[5] Again, the Supreme Court subsequently held EPA exceeded its authority by making new major sources subject to PSD permitting only by virtue of their greenhouse gas emissions, though it upheld BACT requirements for greenhouse gases for sources already subject to PSD review. *See UARG*, 134 S. Ct. at 2447-49.

'they will not be foreclosed from judicial review when the appropriate time comes.'" *Id.* (citing *Grand Canyon Air Tour Coal. v. Fed. Aviation Admin.*, 154 F.3d 455, 473 (D.C. Cir. 1998)).

In addition to *Coalition*, we have determined that petitioners presented after-arising grounds where they could show that a decision by our Court "changed the legal landscape." *Honeywell Int'l, Inc. v. Envtl. Prot. Agency*, 705 F.3d 470, 473 (D.C. Cir. 2013) (explaining that the *Arkema* decision, deeming permanent certain pollutant transfers in a cap-and-trade program, created the premise on which Honeywell's lawsuit was based). On the other hand, we have rejected attempts to manufacture ripeness. We have not been swayed by arguments that the instant parties were not in existence back when the original rule was promulgated. *See Coal River Energy, LLC v. Jewell*, 751 F.3d 659, 662-63 (D.C. Cir. 2014) (construing similar provision under the Surface Mining Control and Reclamation Act). Nor have we been persuaded that "the mere application of a regulation," without anything more, constitutes after-arising grounds. *ARTBA II*, 705 F.3d at 458. If a party could trigger a new 60-day statute of limitations period simply because a regulation was being enforced against it for the first time, our "concerns about preserving the consequences of failing to bring a challenge within 60 days of a regulation's promulgation would be meaningless." *Id.* (quotation marks omitted); *see also Med. Waste Inst. & Energy Recovery Council v. Envtl. Prot. Agency*, 645 F.3d 420, 426-27 (D.C. Cir. 2011) (declining to review an objection raised during the public comment period but not filed within sixty days of the rule).

Simply put, Sierra Club presents us with something closer to the mere application of an old regulation, like in *ARTBA II*, as opposed to a subsequent factual or legal

development creating new legal consequences for petitioners, like in *Coalition* or *Honeywell*. Here, the EPA applied the PSD regulations to Energy Answers' application and issued the PSD permit. Sierra Club's asserted injury did not become any more immediate by virtue of this permit. *See Coalition*, 684 F.3d at 131. We particularly fail to understand how the PSD permit ripened Sierra Club's claim, given that the PSD requirements only apply to attainment pollutants. *See* 42 U.S.C. § 7502(c)(5) (setting forth NNSR permit requirements for new major stationary sources in nonattainment areas). Sierra Club's claim ripened, if at all, following the November 2011 nonattainment designation for lead, when the alleged loophole in the NNSR regulations made it possible for projects like Energy Answers' incinerator to locate in the 4-kilometer nonattainment area while emitting up to 100 tons of lead per year. The PSD permit is beside the point.

\*\*\*

As Sierra Club does not bring its petition within 60 days of any after-arising grounds, its petition is time-barred under 42 U.S.C. § 7607(b)(1). We have no occasion to evaluate its contention that the EPA improperly narrowed the definition of a major stationary source for the sake of "simplicity" back in 1980. For whatever reason, no one challenged this regulation back then, and Sierra Club cannot do so now. The petition is dismissed.

*So ordered.*